RECEIVED

APR 1 5 2026

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

COLEEN ROWLEY, WILLIAM
"BILL" SOREM, FIONA ROEDL,
DARLENE COFFMAN, JANICE
WARD, DAVID EVENHOUSE, AMY
BLUMENSHINE, MIKE MADDEN,
CAROL WALKER, and JOHN DOE
(on behalf of themselves and all others
similarly situated)

Plaintiffs
Pro Se

vs.

BRAD FINSTAD, ANGIE CRAIG,
DEAN PHILLIPS, BETTY
MCCOLLUM, TOM EMMER,
MICHELLE FISCHBACH, PETE
STAUBER, AMY KLOBUCHAR,
TINA SMITH, LLOYD J. AUSTIN III
and PETE HEGSETH;

Defendant

**No. 0: Case 25-cv-02059-ECT-LIB**

**MEMORANDUM IN
OPPOSITION TO
DEFENDANTS'
MOTION TO
DISMISS AND IN
SUPPORT of
PLAINTIFFS'
MOTION FOR
DECLARATORY
JUDGMENT and/or
EVIDENTIARY
HEARING**

1

SCANNED
APR 1 5 2026
U.S. DISTRICT COURT MPLS

# TABLE OF CONTENTS

- TABLE OF AUTHORITIES ................................................... 3-6

- STANDARD OF REVIEW; DECLARATORY RELIEF SOUGHT...…...7-14

- INTRODUCTION AND SUMMARY OF ARGUMENT ...............…....14-19

## ARGUMENT

I.     THE EXISTENCE OF GENOCIDE IS A LEGAL ISSUE THIS COURT CAN AND MUST RESOLVE. ……………….…...............…..19-27

II.     ISSA IS UNCONSTITUTIONAL BECAUSE IT VIOLATES THE GENERAL WELFARE CLAUSE LIMITATIONS ON SPENDING BY CONGRESS. ………………………………………………….27-34

III.     THIS COURT MUST RESOLVE THE CONFLICTS OF LAW IN THIS CASE. ……………………………………………………34-37

IV.     THE POLITICAL QUESTION DOCTRINE CANNOT BE USED TO BAR PLAINTIFFS' LEGAL CLAIMS. …………………….......37-48

V.     PLAINTIFFS HAVE STANDING AS INJURED TAXPAYERS…48-57

VI.     CONCLUSION………………………………………..…… 58

# TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) ...................……...…… 11

*Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019) ……......…18-19, 24-27, 44-45

*Al Shimari v. CACI Premier Technology, Incorporated*, 2026 WL 693110….46-47

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ……………………………...……7

*Baker v. Carr,* 369 U.S. 186 (1962) ……………….…………...……12, 19, 38, 54

*DKT Memorial Fund, Ltd. v. Agency for International Development*, 810 F.2d 1236 (D.C. Cir. 1987) ………………………………….…..………….…… 41

*Defense for Children Int'l-Palestine v. Biden,* No. 4:23-cv-05829-JSW (N.D. Cal. Jan. 31, 2024) or 2024 U.S. Dist. LEXIS 17219, at *8, *16 ………………...15

*Defense for Children Int'l-Palestine v. Biden,* 107 F.4th 926 (9th Cir. 2024).. 11, 47

*Flast v. Cohen,* 382 U.S. 83 (1968) ………..................…... 12, 17, 19, 34, 48-52, 54

*Hein v. Freedom From Religion Foundation, Inc.,* 551 US 578, 602 (2007) ..50-52

*Helvering v. Davis,* 301 U.S. 619 (1937) ........................................... 29-33

*Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, (8th Cir. 2022) ...............50-51

*Huizenga v. ISD No. 11,* No. 24-1862 (8th Cir. 2025) ........................................ 51

*Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221 (1986) ……………………………………...……18-19, 40

*Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018) …………………….....….. 20

*Kadic v. Karadzic,* 70 F.3d 232 (2d Cir. 1995) …………………...…… 25

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ……………….…14

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ........................................... 54

*Mahorner v. Bush*, 224 F.Supp.2d 48 (D.D.C. 2008).............................. 51-52

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .........8, 14, 18, 30, 38-39, 58

*Morton v. Mancari,* 417 U.S. 535 (1974) ....................................................... 36-37

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) .................................. 48

*Planned Parenthood Federation, Inc. v. Agency for International Development,* 838 F2d 649 (2d Cir. 1988) .............................................................…. 41

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 ..............................18, 40-41

*Sierra Club v. Trump,* 929 F.3d 570 (9th Cir. 2019) ...........................…. 45

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..................................….. 20

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ...............18, 37-40

*US v. Butler*, 297 US 1 (1936) ...........................................…...18, 27-33, 49

**U.S. Constitution**

U.S. Const. art. I, § 8, cl. 1 ..........................................13, 27-29, 48, 51-52

U.S. Const. art. III, § 2 ......................................................... 51, 54

U.S. Const. art. VI, cl. 2 .................................................…13, 17, 20

**Statutes**

*"Accomplice Statute,"* 18 U.S.C. § 2 .............................................43-44

*Administrative Procedure Act,* 5 U.S.C. Sections 701 et seq. …......10, 12-14, 34

*Arms Export Control Act,* 22 U.S.C. § 2771 et seq. ...........................…. 35

*Declaratory Judgment Act*, 28 U.S.C. §§ 2201–2202. ...............................… 11

*Elie Wiesel Genocide and Atrocities Prevention Act of 2018*, Pub. L. No. 115-441, 132 Stat. 5586 (2019) .................................................................... 20, 35

*Foreign Assistance Act of 1961*, 22 U.S.C. § 2151 et seq. .............................. 35

*Genocide Convention Implementation Act*, 18 U.S.C. § 109110

.................................................................................17, 20-21, 35, 43-45

*Israel Security Supplemental Appropriations Act, 2024* (ISSA) is Division B of the larger public law: *Making emergency supplemental appropriations for the fiscal year ending September 30, 2024, and for other purposes*, Pub. L. No. 118-50, Div. B, 138 Stat. 895 (2024) ...........................................................7-58

*"Leahy Law"* (as it applies to Dept. of Defense, **codified** at 10 U.S.C. § 362 and as applies to Secretary of State, codified at 22 U.S.C. § 2378d) ....................10, 34-35

## Other Authorities

AMNESTY INTERNATIONAL PUBLIC STATEMENT Date: 27 November 2025 index number: MDE 15/0527/2025 (Israel/OPT: Post-ceasefire: Israel's genocide in the occupied Gaza strip continues - Amnesty International at https://www.amnesty.org/en/documents/mde15/0527/2025/en/) ....................24

Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (*South Africa v. Israel*), **Order** of 26 January 2024, ICJ Rep., para 79 ................................................................................ 21-22

Application of the Convention on the Prevention and Punishment of the Crime of Genocide (*South Africa v. Israel*), Request for **the** Indication of Provisional Measures, Application Instituting Proceedings, filed **29** December 2023, at p. 140-156, paras 101-107. ................................................................. 32

Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (*South Africa v. Israel*), **Request** for the modification of the Order of 28 March 2024, Order of 24 May 2024, **I.C.J.** Reports 2024........... 22

Brief of Amici Curiae Former Diplomats, Service Members and Intelligence Officers in Support of Appellants' Petition for Rehearing En Banc in *Defense for Children Int'l* on Appeal from the U.S. District, Court for the Northern District of California, Case No. 4:23-cv-05829-JSW, https://ccrjustice.org/sites/default/files/attach/2024/03/33.1_3-14-24_Former-Diplomats_w.pdf .................................................................................47-48

*Convention on the Prevention and Punishment of the Crime of Genocide* ("Genocide Convention"), Dec. 9, 1948, 78 U.N.T.S. 277…..10, 17, 20, 26, 35, 45

Joseph Story, *Commentaries on the Constitution of the United States* § 907, at 713 (5th ed. 1891) ................................................................... 28-33

Litz et al., *Moral Injury and Moral Repair in War Veterans: A Preliminary Model and Intervention Strategy*, 29 <u>Clinical Psych. Rev.</u> 695, 695–706 (2009) …..… 55

*Prosecutor v. Netanyahu & Gallant*, ICC-01/18-2024, Warrant of Arrest, (ICC Nov. 21, 2024) ............................................................…..……..…… 21

Rachel Bayefsky, <u>Psychological Harm and Constitutional Standing</u>, 81 Brook. L. Rev. 1555 (2016) ......................................................................... 56

Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, *Anatomy of a Genocide*, U.N. Doc. A/HRC/55/73 (Mar. 25, 2024) ...........................................................................…..… 23

U.N. Independent Int'l Comm'n of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel, *Report of the Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel*, U.N. Doc. A/HRC/60/CRP.3 (Sept. 16, 2025) ….…..… 23

**Rules**

Fed. R. Civ. P. 12(b)(1) ..............................................................…... 7

Fed. R. Civ. P. 12(b)(6) ..............................................................…... 7

## STANDARD OF REVIEW/DECLARATORY RELIEF SOUGHT

## Plaintiffs Have a Valid Cause of Action Seeking Only Judicial Review and Declaratory Relief Under Equitable Principles

Plaintiffs' complaint, as amended via ECF 34, contains sufficient factual matter which if accepted as true, and inferences viewed in the light most favorable to Plaintiffs per *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), should not be dismissed under Fed. R. Civ. P. 12(b)(1) or 12(b)(6). In addition to the previously established and voluminous factual reports of international judicial bodies and human rights organizations cited in the Complaint, a more complete bibliography is attached hereto as Exhibit 1 compiling news and other public source information dated October 2003 to December 2004 providing further evidence of genocide conducted of Palestinians in Gaza enabled in part by U.S. funding and arms.

While Plaintiffs have never abandoned their claim that the *Israel Security Supplemental Appropriations Act, 2024* (ISSA) is a specific congressional enactment, unconstitutional on its face and as implemented for all the reasons further described herein, they waived all compensatory damages as well as their prior request to be certified as a class action and also clarified that they are only suing Defendants in their official capacities, thus seeking only judicial review, i.e.

"emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison* 5 U.S. (1 Cranch) 137, 177 (1803).

Plaintiffs do continue to request relief in the form of a declaratory judgment that the Court declare that Legislative and Executive Branch Defendants violated their duties and Plaintiffs' constitutional rights, and that Executive Branch Defendants should be enjoined from implementing further funding of Israel under the specific congressional enactment of the ISSA.

If necessary or beneficial for the Court to conduct its judicial review, Plaintiffs would request the Court grant a further evidentiary hearing to determine any facts in dispute.

The repeated citing in Defendants' Memorandum in Support of their Motion to Dismiss (ECF 51) of Plaintiffs' *original* complaint (ECF 1) and use of the present tense in their Memorandum may convey a false impression that this is what Plaintiffs still currently seek and assert. Defendants thus seem to misconstrue the current nature of Plaintiffs' Complaint as amended, stipulated to and granted in ECF 31-1, subsequently filed as ECF 34 and which supersedes its original complaint at ECF 1. The following are just a couple of the potentially misleading claims made by Defendants in citing to the original ECF 1 complaint before it was significantly amended:

8

- That Plaintiffs "purport to bring the action on behalf of all federal taxpayers in the state of Minnesota…" However in their Amended Complaint ECF 34, Plaintiffs waived their request to be certified as a class action and now proceed merely as pro se individual plaintiffs. Plaintiffs stated in ECF 31 paragraph 4 "Stipulation Requesting Leave of Court to Amend Complaint in Order to Waive…" (approved by Magistrate Brisbois on 12/11/2025) that: "Because Plaintiffs have not secured representation by a qualified, licensed attorney in this Judicial District, and in order to propose a clearer, more simplified Complaint, Plaintiffs are willing to also waive their request to proceed as a Class Action. Paragraphs about the bringing of a Class Action are therefore redlined to be struck in the proposed Amended Complaint." The entire page 14 of Defendants' argument entitled: "VI. Plaintiffs cannot bring a class action suit" is therefore irrelevant.

- Defendants' lengthy argument for dismissal in pages 9-11, under the heading: "IV. Plaintiffs' claims against the Legislative Defendants are barred by the Speech and Debate Clause," are arguably also irrelevant to Plaintiffs' Amended Complaint at ECF 34. As amended, Plaintiffs merely object to the unconstitutional

actions of "Legislative Defendants" in their official capacities, waive the seeking of *Bivens* liability and all compensatory money damages, effectively seeking only judicial review of the constitutionality of the specific ISSA congressional enactment. While the Speech and Debate Clause does indeed provide significant immunity for congressional votes and other activities, it does not prevent or even hinder the judicial review of the constitutionality of congressional legislation.

Defendants claim Plaintiffs have failed to identify a legal basis for a private cause of action and that their lawsuit fails under the principles of sovereign immunity unless the sovereign consents to be sued by waiving its immunity. But Defendants never mention the Genocide Convention, at the same time belittling as a "smattering" (of law) the various Constitutional provisions relied on by Plaintiffs, the domestic statute implementing that important "Supreme Law of the Land" treaty and the other "*Leahy Laws*" subject to the Administrative Procedure Act (APA) and designed to prevent the "crime of crimes," a term reflecting the exceptional severity and broad nature of the crime of genocide, which is not only intended to allow prosecution of individual persons but to apply to signatory governments and to Convention signatories' own government officials.

10

On page 13 of their Memorandum, Defendants claim that the egregious unlawfulness at issue, that being of the ISSA serving to fund and arm a genocide, is simply a "legislative decision with which Plaintiffs disagree." While the 9th Circuit seemingly normalized the crime of genocide by referring to it as "our country's strategic approach to a major world conflict," in *Defense for Children Int'l-Palestine v. Biden,* 107 F.4th 926, 931 (repeated on pg 8 of Defendants' Memorandum), that court was very wrong to politicize the rule of law. *Jus cogens* violations must never be tolerated as an acceptable "strategic approach" to a country's foreign policy.

Plaintiffs' request for declaratory judgment is a statutory remedy authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, allowing courts to exercise their discretionary power based on principles rooted in equity to make an official, legally binding determination of the parties' rights and obligations when an actual controversy exists between adverse parties, without necessarily ordering any specific action or awarding damages. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937).

Defendants also fail to recognize Plaintiffs have asserted a valid cause of action as taxpayers *qua* taxpayers, not merely as private citizens, by challenging the constitutionality of a specific congressional enactment passed by Congress.

11

Defendants' argument, which more directly goes to standing, is also misplaced. As further detailed below in Argument V., the Supreme Court in *Flast v. Cohen,* 392 US 83 (1968) created a special form of standing for federal taxpayers to sue to prevent the unconstitutional disbursement of federal funds. Plaintiffs, as directly injured federal taxpayers, are therefore "a proper party" with "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional issues." *Id* at 99-100, quoting from *Baker v. Carr,* 369 U.S. 186, 369 (1962). Defendants misread *Flast* and other decisions they cite, as limited to claims related to certain Establishment Clause challenges.

Plaintiffs' causes of action are therefore valid entitling them to pursue their lawsuit against Congress and the Executive for disbursing federal funds for unconstitutional purposes without requiring the sovereign's permission granting a private right of action. Additional congressional grant of authority to seek judicial review was not needed in *Flast* and is not needed here.

Of note in their amended complaint, Plaintiffs asserted another cause of action under the APA, 5 U.S.C. Sections 701 et seq., to provide an additional statutory basis for waiver of sovereign immunity as it applies to the Department of Defense's implementation of the ISSA. ECF 34, pgs 30-31: "Third Cause of

12

Action, Unconstitutional Law in Violation of Ninth Amendment and Article I, Section 8 and Article 6 of the Constitution (pursuant to right to judicial review under the APA against Defendants Austin, Hegseth and any successor Secretary of the Department of Defense)". The APA authorizes judicial review of an agency action when…the action is final and there is no other adequate remedy in a court with respect to that action. Specifically, the APA authorizes federal courts to (1) decide all relevant questions of law; 2) interpret constitutional and statutory provisions and 3) determine the meaning or applicability of the terms to an agency action. The APA authorizes courts reviewing agency actions to, among other things, hold unlawful and set aside agency action, findings, and conclusions found to not be in accordance with law; contrary to constitutional right, power, privilege or immunity or in excess of statutory jurisdiction, authority or limitations or short of statutory right.

When examining an agency's actions, which would include the Department of Defense, previously headed by Lloyd J. Austin III and now headed by Pete Hegseth, a court will generally consider whether 1) the agency action is lawful; 2) the agency adequately supported its factual findings and discretionary decisions; and 3) the agency complied with procedural requirements. Likewise, a reviewing court under the APA must consider whether an agency action exceeds the agency's statutory jurisdiction or authority or if it violates a statutory right.

Highly relevant to the matter at hand, the Supreme Court recently overruled

prior precedent in its landmark decision of *Loper Bright Enterprises v. Raimondo*,

603 U.S. 369 (2024) holding that the APA "requires courts to exercise their

independent judgment… and may not defer to an agency interpretation of the law

simply because a statute is ambiguous." *Id.* at 369. *Loper* was based in large part

on the foundational decision of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)

similarly to Plaintiffs' basis for their request for declaratory judgment, and "makes

clear that agency interpretations of statutes—like agency interpretations of the

Constitution –are not entitled to deference" under the APA § 706. *Loper* at 371.

Therefore, although Defendants' Memorandum correctly notes that the

"Leahy laws" that set forth agency procedures to be followed in order to prevent

funding and arming of genocide do not generally provide for a private cause of

action, these laws cited in Plaintiffs' Complaint should allow, and even require the

Court pursuant to the APA to review the Department of Defense's actions to

determine whether in compliance with these statutes under the APA as well as

with the Constitution and other law.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about genocide and whether it is occurring in Gaza. It is also about whether injured federal taxpayers in Minnesota can be forced to donate their tax dollars to pay for another country's genocide and by proxy to thereby become complicit in it.

The final paragraph in California Federal District Court Judge White's dismissal of plaintiffs' claims, in the first major U.S. legal challenge to Israel's alleged genocidal actions in Gaza, provides a stark visage of a court tortured by a decision it felt compelled to make:

> *"There are rare cases in which the preferred outcome is inaccessible to the Court. This is one of those cases.* **The Court** is bound by precedent and the division of our coordinate branches of government to abstain from exercising jurisdiction in this matter. *Yet, as the ICJ has found, it is plausible that Israel's conduct amounts to genocide. This Court implores Defendants to examine the results of their unflagging support of the military siege against the Palestinians in Gaza."* {Emphasis **added**} *Defense for Children Int'l-Palestine v. Biden*, No. 4:23-cv-05829-JSW (N.D. Cal. Jan. 31, 2024).

While Judge White's final statement does not constitute a factual finding, that District Court clearly felt something needed to be done to curtail the U.S. government's "unflagging support of the military siege against the Palestinians in Gaza" and he "implored" the U.S. government to change its path. Such strong words should give pause as to the grave consequences of the case before us.

Judge White had allowed thorough briefing of all the issues in that case, including public hearings where both sides and credible amici presented their

arguments live and in writing. Judge White took a serious look at the facts of the case, clearly abhorring what he saw, but ultimately claimed helplessness to involve the judicial branch in a case when most of the world was crying out, "Do something to stop this."

The case before Judge White also dealt with the odious accusation of genocide, which our nation has pledged to prosecute, prevent and eliminate. As our executive and legislative branches have chosen thus far to ignore the volumes of factual evidence collected in numerous, detailed international judicial and human rights organizations' investigations, that Israel was and is committing this "crime of crimes," this Court holds the opportunity for our government to condemn this odious practice and state unequivocally, "Genocide is wrong and illegal, no matter who does it."

Admittedly, this Court cannot review or sit in judgment of the discretionary actions and policy choices of the other two branches, or the wisdom of those choices which involve political questions, particularly in the area of foreign policy. But this Court can and must resolve the overriding legal question posed by this case: *Is the spending power of Congress unfettered or are there constitutional limits beyond which Congress and Executive cannot pass?* Plaintiffs maintain that

16

providing funds for a genocide in Gaza is far beyond the acceptable constitutional limits of that power.

If this Court were to find the ISSA, which was Division B of the larger public law: *Making emergency supplemental appropriations for the fiscal year ending September 30, 2024, and for other purposes*, Pub. L. No. 118-50, Div. B, 138 Stat. 895 (2024) to be unconstitutional, Congress and the Executive Branch would find themselves in a comparable position as when the court in *Flast v. Cohen*, 392 U.S. 83 (1968), found a similar spending law unconstitutional. The spending law would no longer have any legal effect, and further disbursement of tax dollars authorized by that law should immediately stop. If Congress and the Executive so desired, they would then need to start over and attempt to create a new spending law that would pass constitutional muster by truly being for the general welfare or common defense of the United States and its tax-paying citizens, and not in violation of the Genocide Convention which became the "Supreme Law of the Land" under Article VI, cl 2 of the Constitution and also not in conflict with the *Genocide Convention Implementation Act*, 18 U.S.C. Section 1091 and other pre-existing U.S. statutes passed in order to prevent the aiding and abetting of genocide.

Two federal courts in California faced with this difficult issue—although distinguishable in that federal officials were sued for monetary damages in those cases, have used the political question doctrine to avoid confronting the challenging legal questions. Unfortunately, those courts abrogated their duty to "say what the law is," and resolve legal disputes and the legal issues they raise. *Marbury v. Madison* 5 U.S. (1 Cranch) 137, 177 (1803).

This Court will be called upon to resolve the following five critical legal issues in this case which are further addressed herein:

I.   Whether Plaintiff Taxpayers' assertion of genocide is plausible and reviewable by this Court as set forth in *Al-Tamimi v. Adelson,* 916 F3d 1, 10-11 (D.C. Cir. 2019).

II.  Whether the supplemental spending enactment for Israel created and passed by Congress, the *ISSA,* was so clearly wrong and blatant display of arbitrary power that it exceeds the constitutional limitation that spending by Congress be for the General Welfare of the United States and its citizens as set forth in *U.S. v. Butler,* 297 U.S. 1 (1936).

III. Whether ISSA spending conflicts with and violates existing U.S. laws, both international and domestic, that prohibit genocide and complicity in it, and whether courts have a legal duty to review and resolve those conflicts, per the holding in *Marbury v. Madison,* 5 U.S. 137 (1803), the "Supremacy Clause" of the Constitution, the APA and the basic canons of statutory construction.

IV.  Whether the Political Question Doctrine can be allowed to quash the purely legal arguments raised by Plaintiff Taxpayers. The decisions of *Zivotofsky ex. rel. Zivotofsky v. Clinton,* 566 U.S. 189 (2012); *Sanchez-Llamas v Oregon,* 548 U.S. 331 (2006); *Japan Whaling*

*Association v. American Cetacean Society,* 478 U.S. 221 (1986) and *Al-Tamimi v. Adelson,* 916 F3d 1 (D.C. Cir. 2019) say it cannot.

V.  Whether Plaintiff Taxpayers have met the unique standing requirements set forth in *Flast v. Cohen,* 382 U.S. 83 (1968) and/or the more traditional injury-in-fact criteria for standing in *Baker v. Carr,* 369 U.S. 186 (1962).

# I. THE EXISTENCE OF GENOCIDE IS A LEGAL ISSUE THIS COURT CAN AND MUST RESOLVE.

The gravamen of this case is genocide, and its presence raises critical *legal issues* for this Court to resolve. Plaintiffs maintain that by passing ISSA, Congress exceeded the constitutional limits of its taxing and spending power because facts indicate the $26.4 billion in supplemental military aid it disburses to Israel was going to be used to support the ongoing genocide against the people of Gaza.

This issue, whether genocide is being committed in Gaza, needs to be examined and resolved by this Court in order to address the sufficiency of Plaintiffs' claim that ISSA was and is unconstitutional as passed or as implemented or both as passed and implemented. This Court has the authority and duty to conduct such a legal inquiry. *Baker v. Carr,* 369 U.S. 186, 211 (1962).

## A. The Law of Genocide:

The prohibition of genocide is a universally recognized norm of international law from which nations may not deviate, fully implemented into U.S.

law by treaty ratification and statute. Horrified by the mass killing of Jews in World War II, the community of nations codified genocide in 1948 as "a crime under international law . . . condemned by the civilized world." *Convention on the Prevention and Punishment of the Crime of Genocide* ("Genocide Convention"), Dec. 9, 1948, 78 U.N.T.S. 277.

The prohibition of genocide, which includes prohibition of complicity in and a legal duty to prevent its commission, is a peremptory, or *jus cogens,* norm of international law from which no derogation is allowed; it is mandatory law compelling compliance by both nations and individuals. This *jus cogens* norm "prohibits acts repugnant to all civilized peoples," *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 262 (2018), and makes their perpetrators "enem[ies] of all mankind." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004).

The prohibition of genocide was enshrined in U.S. law through the 1987 *Genocide Convention Implementation Act*, 18 U.S.C. § 1091, and *the Elie Wiesel Genocide and Atrocities Prevention Act of 2018*, Pub. L. No. 115-441, 132 Stat. 5586 (2019). Thus, the prohibition of genocide occupies a distinctive place under both international and domestic law as the "Supreme Law of the Land," a peremptory norm and non-derogable legal duty. U.S. Const. art. VI, cl. 2.

U.S. judges have a role in enforcing these solidly ingrained *jus cogens* norms under international humanitarian law as well as under the *Genocide*

20

*Convention Implementation Act,* 18 U.S.C. § 1091 that criminalizes genocide, a felony crime subject to the death penalty, and complicity in genocide. Defendants have a specific legal obligation to prevent, and not further, genocide. Violating clear legal duties arising from a *jus cogens* norm, treaty and established in U.S. law by Congress can never be a discretionary policy choice or a "strategic approach" for either Congress or the Executive Branch. Whether a violation occurred is, of course, a legal issue subject to the Court's adjudication.

## B. The Law Applied to Israel:

Israel has been charged in the International Court of Justice (ICJ) with the crime of genocide as have several of its highest political and military leaders who are now subject to arrest under warrants issued by the International Criminal Court. *Prosecutor v. Netanyahu & Gallant,* ICC-01/18-2024, Warrant of Arrest, (ICC Nov. 21, 2024).

Israel's massive carpet bombing destruction of Gaza and its civilian population, coupled with its leaders' publicly announced genocidal intents and incitements in the aftermath of the October 7th attacks, were seen as so extreme that the international community, led by South Africa, brought a charge of genocide against Israel in the ICJ. Based on preliminary hearings and testimony, the ICJ In January 2024 delivered an interim judgment, finding it plausible that Israel was committing genocide while reserving its final determination upon the conclusion of

its investigation.   *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, Order of 26 January 2024, ICJ Rep. para 79; https://www.icj-cij.org/node/203447.

As Israel's violence against the civilian population of Gaza continued to escalate, in March 2024, the ICJ ordered Israel to cease its prevention of the delivery of food, water, medical supplies into Gaza which was beginning to show signs of widespread famine. In May 2024, the ICJ ordered Israel to immediately halt its attack on Rafah. *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, Request for the modification of the Order of 28 March 2024, Order of 24 May 2024, I.C.J. Reports 2024.  Israel denied the claims and refused to comply with those and subsequent orders of the ICJ.

Numerous human rights organizations including Amnesty International, Human Rights Watch, Médecins Sans Frontières (Doctors Without Borders), University Network for Human Rights, B'Tselem, and Physicians for Human Rights - Israel, have also conducted extensive investigations and published detailed factual findings, concluding Israel is committing genocide in Gaza.  The International Association of Genocide Scholars, as well as other genocide scholars and experts, some from Israel, have come to similar conclusions.  Attached Exhibit

22

1 lists dozens of news reports from October 2023 to December 2024 containing these and other factual findings.

UN Special Rapporteur Francesca Albanese also extensively documented the "Anatomy of a Genocide" in *Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Anatomy of a Genocide*, U.N. Doc. A/HRC/55/73 (Mar. 25, 2024).

Even more recently, the United Nations Independent International Commission of Inquiry on the Occupied Palestinian Territory, after an extensive investigation resulting in a 72 page report, concluded Israel was and is committing genocide in Gaza. *Report of the Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel*, U.N. Doc. A/HRC/60/CRP.3 (Sept. 16, 2025). The Commission concludes on reasonable grounds that Israeli authorities and security forces have committed and are continuing to commit the following *actus reus* of genocide against the Palestinians in the Gaza Strip, namely:

(i) killing members of the group;

(ii) causing serious bodily or mental harm to members of the group;

(iii) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; and

(iv) imposing measures intended to prevent births within the group.

Since the institution of a "ceasefire" on October 10, 2025, the Gaza Health Ministry reports that over 700 Palestinians have been killed by Israeli fire. Israel's continued restriction of food, shelter materials, medicine, and other life-sustaining aid indicate its genocide is ongoing. Amnesty International documents: "Israel's genocide against Palestinians in Gaza continues unabated despite ceasefire…More than a month after a ceasefire was announced and all living Israeli hostages were released, Israeli authorities are still committing genocide against Palestinians in the occupied Gaza Strip, by continuing to deliberately inflict conditions of life calculated to bring about their physical destruction, without signaling any change in their intent…" The organization provides a legal analysis of the ongoing genocide along with testimonies from local residents, medical staff and humanitarian workers highlighting the dire ongoing conditions for Palestinians in Gaza. AMNESTY INTERNATIONAL PUBLIC STATEMENT Date: 27 November 2025 index number: MDE 15/0527/2025 (Israel/OPT: Post-ceasefire: Israel's genocide in the occupied Gaza strip continues - Amnesty International at https://www.amnesty.org/en/documents/mde15/0527/2025/en/).

## C. The Existence of Genocide is a Legal Issue

Courts have recognized that claims that a party committed genocide are justiciable. In *Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019), the court held

that whether "Israeli settlers are committing genocide is a purely legal issue" that a court could resolve. *Id.* 11-12. Since "it is well settled that genocide violates the law of nations" (international law) and has a legal definition under the Genocide Convention art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, 280 defining genocide, in part, as "[k]illing members of [a national, ethnic, racial or religious group]" "with intent to destroy [the group], in whole or in part"), "a judicially manageable standard to determine whether Israeli settlers are committing genocide" exists, allowing for a court to hear the claim that Israeli settlers were committing genocide. *Id.* This could include past and present factual and legal findings on this issue by the ICJ as well as findings of genocide by various human rights organizations.

While *Al Tamimi* involved claims under the Alien Torts Act, its conclusion that whether genocide has occurred in a case is a *legal* inquiry, constitutes valid precedent for the instant case. Furthermore, a judicially manageable standard for adjudicating this issue can be achieved by incorporating international law and the definitions, factual findings, and legal decisions included within it.

In *Kadic v. Karadzic*, 70 F.3d 232, 249-50 (2d Cir. 1995) the court provided a very thorough analysis of the applicability of the law of nations to the crime of genocide, concluding that genocide claims were justiciable.

25

## D. Applying *Al-Tamimi* to the Present Case

Plaintiffs in this case claim that genocide was and is being committed in Gaza which already was found to be plausible by the ICJ and numerous international human rights authorities, thus supporting their claim that the ISSA spending is unconstitutional because the $26.4 billion appropriation provided Israel with arms and munitions, used to continue the genocide in Gaza.

The Court's purpose in this task would not be to sit in judgment of the wisdom of Israel's or Hamas' actions, but merely to see whether there is sufficient legal evidence of the existence of genocide in Gaza to conclude that Plaintiffs' assertion that genocide is being committed in Gaza, is plausible and thereby justifies their challenge of ISSA as an unconstitutional use of taxpayer dollars.

Nor would it be the purpose of this inquiry to adjudicate guilt or innocence. Rather, it would be to find whether or not sufficient, already-well investigated and adjudicated facts have been established to support Plaintiff Taxpayers' assertion that genocide is being committed in Gaza. This Court has the legal authority to adjudicate that critical question by taking judicial notice of the definition of genocide found in the *Genocide Convention* and by incorporating the law of nations including the body of evidence now available through ICJ hearings, legal findings, and from thorough investigations by respected human rights organizations.

This Court need not conduct a full-scale evidentiary hearing into this question in which the parties would call witnesses, legal experts, and the like. The overwhelming body of factual evidence available via prior international adjudications by the ICJ and ICC, as well as numerous detailed findings by United Nations entities and human rights organizations cited herein, are sufficient to allow this Court to determine, per the holding in *Al -Tamimi,* whether Plaintiffs claims are factually valid, that an ongoing genocide is taking place in Gaza.

Alternatively the Court could order an evidentiary hearing to ascertain any facts in dispute.

## II.  ISSA IS UNCONSTITUTIONAL BECAUSE IT VIOLATES THE GENERAL WELFARE CLAUSE LIMITATIONS ON SPENDING BY CONGRESS.

The ISSA funding enactment is unconstitutional because it violates and conflicts with the general and overriding provision that Congress not enact legislation that exceeds the scope of the Taxing and Spending Power under Article I Sec. 8 of the Constitution but limits it to spending "to provide for the Common Defense and the General Welfare," *US v. Butler*, 297 US 1 (1936). Defendants' illegal funding and enabling of an ongoing genocide is the very antithesis of what the Constitution and other laws allow.

### A.  The *Butler-Helvering-Story* Standard for General Welfare Clause Spending Limitations:

*Butler* held that the power of Congress to spend public money for public

purposes while broad, is not unlimited and is subject to limitations that such

spending be in pursuit of the common defense or general welfare. *Id.* at 66. It also

held that:

> "When an Act of Congress is appropriately challenged in a Court, it is
> the duty of the court to compare it with the article of the Constitution which
> is invoked and decide whether it conforms to that article" and "all that the
> court does or can do in such cases is to announce its considered judgment
> upon the question; it can neither approve nor condemn any legislative
> policy; it can merely ascertain and declare whether the legislation is in
> accordance with, or in contravention of, the provisions of the Constitution."
> *Id.* at 62.

The *Butler* Court also cited Justice Joseph Story's analysis in his *Commentaries on*

*the Constitution of the United States,* § 907, at 713 (5th ed. 1891). The Justice

provided examples of unconstitutional forms of taxing and spending outside the

limitations of the general welfare and common defense such as for wholly

extraneous purposes:

> "If the defense proposed by a tax be not the common defense of the
> United States, if the welfare be not general, but special, or local, as
> contradistinguished from national, it is not within the scope of the
> constitution. If the tax be not proposed for the common defense, or general
> welfare, but for other objects, wholly extraneous, (as for instance, for
> propagating Mahometanism among the Turks, or giving aids and subsidies
> to a foreign nation, to build palaces for its kings, or erect monuments to its

heroes,) it would be wholly indefensible upon constitutional principles." (*Id.* at § 919.)[1]

In *Helvering v. Davis*, 301 U.S. 619 (1937), the court affirmed the limits on Congress's taxing and spending authority set forth in *US v. Butler* and in Justice Story's Commentaries:

> "Congress may spend money in aid of the 'general welfare.' In drawing the line between what is 'general' welfare, and what is particular, the determination of Congress must be respected by the courts, unless it be plainly arbitrary. Courts should not second-guess Congress's decision, the Supreme Court stated, unless its 'choice is clearly wrong, a display of arbitrary power, not an exercise of judgment,' such that there is 'no reasonable possibility' that the legislation fall[s] within the wide range of discretion permitted to the Congress." *Id.* at 640-641.

In *Helvering, Id.,* the Court then cited two reasons to defer to Congress's judgment with respect to the controversial Social Security Act which many at the time felt exceeded congressional powers under the Constitution in violation of the limits imposed by the General Welfare clause. First, the Court concluded that the statute was not a display of arbitrary power:

> "Congress did not improvise a judgment when it found that the award of old age benefits would be conducive to the general welfare." Instead, Congress had held hearings and made legislative findings showing that the

---

[1] There is no little irony in Justice Story's choice of examples of unconstitutional violations of the General Welfare Clause, both of which involved unconstitutional spending for foreign aid, and in the Middle East! In this case, US tax dollars are arguably being expended to promote Zionism in Palestine, similar to "…propagating Mahometanism among the Turks."

"number of persons" aged 65 and older in the United States who are "unable to take care of themselves [was] growing at a threatening pace." *Id.* at 641.

Second, the Court saw the "problem (as) plainly national in area and dimensions. Moreover, laws of the separate states cannot deal with it effectively." *Id.* at 644.

The Court reiterated its limited role in evaluating whether spending legislation comports with the Spending Clause:

> "Whether wisdom or unwisdom resides in [this] scheme of benefits ... is not for us to say. . . Our concern here, as often, is with power, not with wisdom." *Id.*

**B. Congress' Passage of ISSA Would Qualify as an Arbitrary Unconstitutional Abuse of its Spending Power If It Passed ISSA Knowing and/or Intending the Funds Would Be Used to Assist Israel's Ongoing Genocide in Gaza.**

Even though, under the criteria set forth in *Helvering, Id.,* Congress does possess broad discretion which must be respected by the courts, if a law is challenged as arbitrary and unconstitutional, if Congress's "choice is clearly wrong," it's still "emphatically the province and duty of the Judicial Department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Furthermore, it should be noted that the *Butler* and *Helvering* decisions, upholding justiciability and requiring judicial review as to whether congressional legislation was for the "general welfare" concerned congressional funding choices

30

affecting U.S. domestic plaintiffs and domestic population. This is in strong contrast with the examples listed by Justice Story of more questionable, "wholly extraneous" congressional funding of foreign powers that he claimed would be "wholly indefensible upon constitutional principles" as not in furtherance of the common defense or general welfare.

Applying these *Butler-Helvering-Story* criteria, Plaintiffs first argue that Congress's passage of the ISSA far exceeded the constitutional General Welfare Clause limits of its spending power for the following reasons:

1. ISSA was designed specifically to benefit Israel as it was committing genocide in Gaza in violation of international law and the domestic statutes cited herein. It cannot, therefore, qualify as spending for the general welfare of the people of the United States.

2. Israel's need for $26.4 billion more in arms and munitions a mere four months after receiving its annual military aid stipend from the U.S. of $3.8 billion (which constituted a 7-fold increase in arms and munitions requirements in less than four months).

3. The expenditure by Israel in Gaza of an estimated 70,000 tons of bombs and other munitions in the six months after October 7, 2023, compares to only 18,000 tons dropped on London during the entire blitz of World War II. This demonstrates how massive and indiscriminate was Israel's bombing campaign in Gaza.

4. The killing by Israel of some 30,000 civilians in Gaza in the first six months reflects Israel's savage, unrestrained bombing campaign after October 7, 2023.

5. In sharp contrast to the criteria set forth by the courts in *Butler-Helvering,* Congress acted arbitrarily and demonstrated no exercise in judgment as it didn't hold hearings or make legislative findings

31

concerning the highly controversial negative effects of the massive ISSA spending bill despite the fact that Israel's genocidal actions in Gaza had already been openly, explicitly announced by Israeli leaders and were already under immense scrutiny in the U.S. and international sphere.

6. A key finding by the ICJ in January 2024 was based on genocidal intent being so obviously and openly admitted by various Israeli government figures. Application of the Convention on the Prevention and Punishment of the Crime of Genocide (*South Africa v. Israel*), Request for the Indication of Provisional Measures, Application Instituting Proceedings, filed 29 December 2023, at p. 140-156, paras 101-107.

7. Rather than subjecting the controversial ISSA spending bill to open and transparent scrutiny through public hearings, as had the courts in *Butler*, and *Helvering*, Congress employed two common subterfuges to "hide the ball" on controversial legislation:

   a. It gave the bill *emergency* status which made it exempt from budget caps and pay-as-you-go rules and conducted no public inquiry into whether the spending met the five OMB criteria for qualifying as an emergency: that expenditure is necessary, sudden, urgent, unforeseen, and not permanent.

   b. To further avoid drawing public attention and likely embarrassing scrutiny of a massive spending bill for Israel, Congress designated it as a *closed bill* which prevents debate and unwanted amendments typically forcing members to vote on it as it was originally written. It is used to hide internal divisions and prevent provoking embarrassing debates on sensitive political issues such as foreign aid for Israel.

The Congressional choice in April 2024 to help fund Israel's genocide was a textbook display of the exercise of arbitrary power because Congress refused to hold hearings or make legislative findings and recommendations based on widespread and credible information that genocide was happening in Gaza and the

likelihood that ISSA funds allocated to Israel would almost certainly be employed to continue that genocide. It was not an "exercise of judgment" as mandated by *Butler-Helvering* criteria and thus "no reasonable possibility" exists that the legislation fell within the wide range of discretion normally allowed Congress.

### C. Even if Congress Passed ISSA Without Considering the Funds Could Be Used to Commit Genocide, and Israel Unlawfully Directed ISSA Funds for that Purpose, ISSA would still be Unconstitutional.

Even if Congress was largely oblivious to the likelihood of misuse of ISSA funds to support the ongoing genocide in Gaza, the evidence of genocide being committed in Gaza allows a clear inference that Israel unlawfully directed ISSA funds from purely military uses to its ongoing campaign of genocide in Gaza. Taxpayers, confronted with overwhelming evidence of genocide and the obvious use of ISSA funds for that unlawful purpose, could well object to that ongoing unlawful use of taxpayer dollars and demand that ISSA as implemented be declared unconstitutional to prevent further transfer of taxpayer dollars to Israel for use in its ongoing genocide in Gaza.

This would also constitute a violation of the General Welfare Clause limitation on spending by Congress as the funds were/are being misdirected in support of an unlawful purpose. Moreover, in the present case, ISSA funding doesn't end until mid-2026, so a declaration of unconstitutionality should bring an immediate halt to further ISSA disbursements.

33

In either scenario, also based on lack of adherence to APA and Leahy law procedures governing the Department of Defense, the ISSA should be deemed unconstitutional.

## III.  THIS COURT MUST RESOLVE THE CONFLICTS OF LAW IN THIS CASE.

As previously set forth, the Constitution's Supremacy Clause governs when a statute such as ISSA conflicts with the Constitution. The Supreme Court in *Flast v. Cohen,* 382 U.S. 83 (1968) made clear that Congress does not have the power to pass laws that violate the highest law in the land, the US Constitution. Moreover, when a law is found to be unconstitutional, it loses all legal effect and becomes unenforceable. In *Flast*, that meant all funding allocated for religious schools immediately stopped.

Plaintiffs aver that Congress's supplemental funding of Israel was and is used to help fund and continue the genocide in Gaza. Ample hard evidence of this abounds which Plaintiffs will produce if the Court wishes to grant a hearing. Even without a further hearing, the already voluminous, publicly available evidence adduced by international courts and human rights organizations' investigative reports reveals ISSA funding to clearly conflict with the Constitution as well as

with several existing federal statutes prohibiting/preventing genocide and complicity in genocide, including the following:

- *Convention on the Prevention and Punishment of the Crime of Genocide*, 78 U.N.T.S. 277 (1948) signed and ratified by the US in 1988.

- Customary international law and Article 6 of the U.S. Constitution, which makes laws and treaties, once ratified, the "supreme law of the land."

- *The Genocide Convention Implementation Act*, 18 U.S.C. § 1091 which prohibits and criminalizes genocide and complicity in genocide, as a serious felony, punishable in some circumstances with the death penalty.

- *The Elie Wiesel Genocide and Atrocities Prevention Act of 2018*, Pub. L. No. 115-441, 132 Stat. 5586 (2019).

- *The "Leahy Law"* (See 10 U.S.C. § 362; 22 U.S.C. § 2378d) passed in 1997 which requires the U.S. government to vet foreign security forces and to terminate U.S. aid to those that fail to remediate human rights abuses.

- *The Foreign Assistance Act of 1961* (22 U.S.C. § 2151 et seq.) and *Arms Export Control Act* (22 U.S.C. § 2771 et seq.), which prohibit assistance to any country in which the government engages in a consistent pattern of gross violations of internationally recognized human rights, and require the advancement of U.S. foreign policy interests consistent with internationally-recognized human rights norms and laws including the Geneva Conventions of 1949.

When there is an apparent conflict between pre-existing federal statutes, including the laws cited above and a later federal law such as ISSA, courts use basic canons of statutory construction such as: 1) the "Later-in-Time" general presumption that the statute enacted more recently controls; 2) the "Specific over

35

General Rule" so that the more specific provision of law takes precedence, and 3) "Harmonization," i.e. courts first try to read statutes in a way that avoids a conflict altogether, harmonizing them so they work together rather than against each other. Courts generally presume, however, that Congress does not intend to repeal an earlier statute unless there is clear and express language indicating such intent. This presumption is particularly strong when the later statute is general and the earlier statute is specific. *Morton v. Mancari*, 417 U.S. 535 (1974).

Application of these principles in *Morton, Id.* led to that court's decision that a pre-existing Bureau of Indian Affairs' hiring preference enacted to benefit the hiring of Indians could not be implied to have been repealed by the later EEO anti-discrimination law. *Id. at* 548-551.

The conflicts between federal laws that exist in this case are not only similar to but of greater magnitude than those in *Morton, Id.* thus raising the following legal questions that this Court should resolve through statutory interpretation:

- Whether Congress can pass a new, but more vague spending law that conflicts with several, far more specific, pre-existing laws cited above without first explicitly revoking the prior conflicting laws.

- Assuming Congress intends consistency, and courts should try to harmonize laws passed by Congress, how could the ISSA spending bill predominate over the series of very specific laws Congress passed over many years to prohibit and prevent the commission of genocide?

- Could this Court apply the "Harmonization Rule" to find that Congressional members who passed ISSA did so too quickly, without

adequate reflection, therefore negligently (despite the prior ICJ ruling of "plausible genocide") lacking understanding that the U.S. tax money they allocated would be spent to commit genocide in Gaza?

Applying the same analysis in *Morton, Id.*, this Court should be similarly "loathe to imply this improbable result" (*Id. at* 549.) i.e. that the passage of ISSA somehow implied suspension of the earlier federal statutes criminalizing the commission of genocide and aimed at preventing such heinous crime.

## IV. THE POLITICAL QUESTION DOCTRINE CANNOT BE USED TO BAR PLAINTIFFS' LEGAL CLAIMS

Plaintiffs maintain both Congress and executive branches are violating laws prohibiting genocide and complicity in genocide. While foreign policy decisions are generally committed to the political branches, the Supreme Court has repeatedly made clear that assessing the *legality* of these decisions is a task the Constitution assigns to the judicial branch.

### A. The political question doctrine bars judicial inquiry questioning the wisdom of government actions but permits inquiry into the legality of its actions.

The political question doctrine is "a narrow exception" to the rule that "the judiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) (citations omitted).

The doctrine bars claims that challenge the government's policy judgment, i.e., that essentially ask courts to make foreign policy. But it does not impede courts' authority to ensure that the political branches' conduct of foreign affairs conforms to the law. This is simply an application of the principle established in *Marbury v. Madison*, 5 U.S. (Cranch 1) 137 (1803):

> "It is emphatically the province and duty of the Judicial Department to say what the law is. Those who apply the rule to particular cases must, of necessity, expound and interpret that rule. If two laws conflict with each other, the Courts must decide on the operation of each." *Id.* at 177.

In *Baker v. Carr*, 369 U.S. 186 (1962), the Court established the modern political question doctrine test: a case is nonjusticiable if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.* at 217. *Baker* made clear that the doctrine "is one of 'political questions,' not one of 'political cases,'" *Id.*, and "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211.

The doctrine precludes controversies about "policy choices and value determinations constitutionally committed" to Congress or the Executive. *Id.* But courts "have the authority to construe treaties . . . and . . . legislation" and to address other "legal question[s] of statutory interpretation" in the foreign-policy realm. *Id.*

In the instant case, this Court will be called upon to decide whether a ratified and fully implemented U.S. treaty with other nations and other federal laws that conflict with a spending law passed by Congress are subordinate or are indeed (in the case of the treaty) the "supreme law of the land."

Per *Marbury*, 5 U.S. (1 Cranch) 137 (1803), "If two laws conflict with each other, the Courts must decide on the operation of each." *Id. at* 177.

## B. Per *Zivotofsky v. Clinton*, Plaintiffs' legal claims must be adjudicated even in the presence of major "political questions."

The Supreme Court reiterated this distinction in *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012), its most recent application of the political question doctrine in the foreign affairs field. There, the plaintiff claimed that the Executive's action, pursuant to its foreign policy, violated established law. *Id*. at 193. The Court held that the political question doctrine did not prevent the Court from determining whether the Executive's action was illegal. *Id*. at 201. Likewise, in the instant case, the political question doctrine should not prevent this Court from determining whether congressional and/or executive action was illegal. Both cases involve legal issues that are exclusively within the purview of the judicial branch.

In *Zivotofsky*, a statute allowed Americans born in Jerusalem to list "Israel" as their birthplace on their passports. *Id.* at 191. The State Department declined to follow the law, given its policy of taking no position on Jerusalem's political status. *Id.* When a Jerusalem-born American sued, the Department argued that the case was barred by the political question doctrine. *Id.*

But the Supreme Court rejected that argument even though the Department's foreign policy toward Israel was at issue. *Id.* at 191. The case was justiciable because the claim did not challenge the wisdom of government policy but instead challenged its legality based on the statute at issue. *Id.* at 196-97.

## C. Foreign Policy and the Political Question Doctrine:

Cases asking courts "to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy . . . should be" are not justiciable. *Id.* at 196. But cases asking courts to enforce a specific statute – "a familiar judicial exercise" – are justiciable. *Id.* at 196.

The Supreme Court also held in *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221 (1986) that the political question doctrine does not prevent federal courts from adjudicating questions involving the interpretations of international treaties. *Id.* at 229-230. And in *Sanchez-Llamas v. Oregon*, 548 U.S.

40

331, the Court (again quoting from *Marbury*) stated that "If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law "is emphatically the province and duty of the judicial department". *Id.* at 353-354.

Courts also decide legal questions that have foreign policy implications in cases involving foreign aid. See, e.g., *Planned Parenthood Federation, Inc. v. Agency for International Development,* 838 F.2d 649 (2d Cir. 1988) (holding that a challenge to legality of restriction of speech on abortion for recipients of federal funds was a justiciable challenge to unlawful implementation, not a challenge to the wisdom of the foreign aid policy), and *DKT Memorial Fund, Ltd. v. Agency for International Development*, 810 F.2d 1236 (D.C. Cir. 1987) (holding challenges to the legality, as opposed to the wisdom, of the implementation of foreign policy not to contribute funds to foreign NGOs that perform abortions are justiciable).

In the instant case, Plaintiff Taxpayers are clearly challenging the legality of a law involving foreign aid to Israel but not challenging the policy choices and wisdom of providing foreign aid to Israel or the amounts involved. Instead, they are challenging the unlawful use of the funds being allocated to Israel in support of genocide in Gaza as unconstitutional. As such, this Court should address and resolve this legal issue: Is genocide being committed in Gaza and are ISSA funds being wrongfully misdirected for that unlawful purpose?

41

The political branches' responsibility to undertake foreign policy does not vitiate the judiciary's constitutional obligation to determine legal questions related to that policy.

### D. The Bad Policy vs. Illegal "Policy" Distinction

Because the political question doctrine permits courts to determine the legality of executive action even in the realm of foreign policy, the question here is straightforward: are Plaintiffs alleging that Defendants' acts are bad policy or that they are illegal? Either scenario could apply: It may be bad policy to give foreign aid to Israel, and it may demonstrate a lack of wisdom by Congress, but those are not legal issues for the judiciary to resolve.

However, if a specific spending enactment is used for an unlawful purpose, that is a legal issue for the Court to determine. The spending could be used for an unlawful purpose because Congress acted arbitrarily in creating a spending law that unconstitutionally allocated funds to Israel knowing they would likely be used to assist the ongoing genocide in Gaza. Or, Congress could have allocated the funds to Israel not knowing or not considering that Israel would misdirect the funds to assist the genocide in Gaza, which would also be an unconstitutional use of ISSA funds.

The legal issue for the Court in either case would be to determine whether genocide is being committed in Gaza and whether ISSA funds were and are being unlawfully used to assist that ongoing genocide.

Plaintiffs do not challenge the wisdom of U.S. policy choices regarding military sales or other support to Israel. Instead, they assert that providing arms and other support to Israel after being put on notice by findings of the ICJ (and numerous other international and domestic investigative reports) that genocide was and is being committed in Gaza was/is illegal.

U.S. federal law on genocide does prohibit the aiding and abetting of genocide, and it applies even when the genocide occurs outside the United States. The statute criminalizes not only committing genocide but also participating in it through assistance, conspiracy, or other forms of complicity.

18 U.S.C. § 1091, the "Genocide Implementation Act" defines genocide and establishes penalties up to the death penalty. It includes liability for attempt, conspiracy, and direct participation. Even when a statute does not explicitly list "aiding and abetting," 18 U.S.C. § 2 applies to all federal crimes unless expressly excluded. This means anyone who aids, abets, counsels, commands, induces, or procures the commission of genocide is punishable as a principal.

Congress enacted § 1091 specifically to implement U.S. obligations under the Genocide Convention, which requires states to criminalize genocide and related

43

forms of complicity. U.S. courts have recognized that genocide is an international crime and that Congress intended broad, extraterritorial reach. Legal organizations have recently warned U.S. officials that aiding, abetting, inciting, or conspiring to commit genocide can create liability under U.S. and international law.

The aiding and abetting of genocide in a foreign country is thus prohibited under U.S. law, this liability arising from the combination of:

- 18 U.S.C. § 1091 (genocide statute)

- 18 U.S.C. § 2 (aiding and abetting)

- U.S. obligations under the Genocide Convention

Defendants thus have a specific legal mandate to prevent, and not further, genocide. Violating clear legal duties arising from a *jus cogens* norm and established in U.S. law by Congress can never be a discretionary policy choice or a "strategic approach" for either Congress or the Executive Branch.

## E. Whether Genocide is being committed is a Legal Issue not a Political Question

Courts have recognized that claims that a party committed genocide are justiciable. *Al-Tamimi v. Adelson* (discussed in greater detail on pages 24-27), held that whether Israeli settlers were committing genocide was a legal issue that a court could resolve. While *Al-Tamimi* distinguished the question of who has sovereignty over the West Bank, Gaza, and East Jerusalem as being reserved to the political

branches, the question of whether Israeli settlers were committing genocide was justiciable because it "is a purely legal issue." *Al-Tamimi,* 916 F.3d 1, 11-12 (D.C. Cir. 2019).

Even though genocide perpetrators in the present case are allegedly not only settlers as in *Al-Tamimi* but also foreign government and military officers (as were the Nazi defendants at the Nuremberg Trials), and this was something the *Al-Tamimi* Court did not have to decide, the issue of whether genocide was/is being committed in Gaza, is similarly a purely legal issue for this Court to decide.

And, since it is well settled that genocide violates the law of nations and has a legal definition under the United Nations Convention on the Prevention and Punishment of the Crime of Genocide (as well as under the "Genocide Implementation Act" 18 U.S.C. § 1091), a judicially manageable standard exists.

Deciding that legal challenge does not contravene separation of powers concerns as federal courts have the power and the responsibility to apply the law. E.g. In *Sierra Club v. Trump,* 929 F.3d 670 (9th Cir. 2019), a challenge to President Trump's decision to reallocate funds to build a border wall raised a legal challenge and was therefore not barred as a political question.

In short, there is no basis for the assumption that whenever the Congress and/or Executive acts in the foreign policy realm, courts lack the power to issue even a declaratory judgment finding these other branches have violated the law.

While the judiciary must not overstep its constitutionally prescribed role, it also must not shirk its constitutional obligation to ensure that the conduct of foreign affairs, whether by Congress and/or the executive branch, conforms to the law.

The legal questions raised by Plaintiffs in this case, whether genocide was/is being committed in Gaza and whether ISSA funding aids and abets that genocide should be adjudicated by this Court even while questions of the wisdom of the policy or law, or the relationship between Israel and the people of Gaza, or the relationship between the US and Israel, remain nonaddressable as nonjusticiable political questions.

### F. A holding that no court may consider whether Defendants are violating the *jus cogens* international and domestic legal prohibitions on genocide will undermine U.S. foreign policy and erode the authority of law itself.

As described above, the question of whether the Defendants' acts violate the law is a legal question, not a political one, and is therefore justiciable. A holding that courts cannot decide whether Defendants' actions are legal would not only expand the political question doctrine beyond its recognized bounds but would essentially erode U.S. law. It would greatly undermine official U.S. policy to prevent genocide, the credibility of U.S. commitment to that goal, and thus U.S. ability to continue to exercise world leadership on vital moral, ethical, and legal questions. In accord is the recent (March 12, 2026) decision in *Al Shimari v. CACI*

46

*Premier Technology, Incorporated,* 2026 WL 693110 which, after years of

litigation, upheld a jury verdict finding unlawful torture was perpetrated by

government contractors at Abu Ghraib prison in Iraq. *Al Shimari* made clear that

allowing that case to proceed not only lacked any potential to negatively affect

foreign relations, but the greatest threat to foreign relations would result if the case

was NOT permitted to proceed. "The crucial distinction here is whether CACI's

actions were unlawful or if they were in a 'grey area'—although the

reasonableness of military conduct may not be justiciable, the *lawfulness* of that

conduct assuredly is." *Id.* at *20, also citing *Shimari IV,* 840 F.3d at 162 and

numerous other Supreme Court precedents including *Marbury v Madison*, 5 U.S.

(1 Cranch) 1803.

As set forth in the Brief of Amici Curiae Former Diplomats, Service

Members and Intelligence Officers in Support of Appellants' Petition for

Rehearing En Banc in *Defense for Children Int'l* on Appeal from the U.S. District,

Court for the Northern District of California, Case No. 4:23-cv-05829-JSW,

https://ccrjustice.org/sites/default/files/attach/2024/03/33.1_3-14-24_Former-

Diplomats_w.pdf, a refusal "to even consider whether Defendants' acts violate the

law prohibiting support for genocide would show that in the United States,

government support for genocide is beyond the law's reach." A refusal "to apply

the law (of genocide) would seriously erode the United States' moral authority and

influence on the international stage and will have lasting impacts on the effectiveness of U.S. foreign policy, as well as on international peace and security." *Id.* at 10.

No warning has perhaps ever been more prescient about the danger of rationalizing government impunity than that of Supreme Court Justice Brandeis in his famous Olmstead dissent: "Our government is the potent, the omnipresent teacher. For good or for ill it teaches the whole people by example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead v. United States*, 277 U.S. 438, 485 (1928). Justice Brandeis was proven right.

## V.    PLAINTIFFS HAVE STANDING AS TAXPAYERS

In *Flast v. Cohen* 382 U.S. 83 (1968), the Supreme Court set forth unique standing requirements for taxpayers challenging the legality of acts of spending by Congress under its authority in Article III, Section 2 of the US Constitution: First, Plaintiffs must be taxpayers who are alleging Congress abused its taxing and spending power under Article I, Section 8. Second, they must show that the challenged spending is in violation of a specific constitutional protection against the abuse of legislative power. *Id* at 103-106.

Plaintiffs meet the *Flast* requirements for standing as they are taxpayers from the State of Minnesota who maintain that ISSA created and passed by Congress on April 23, 2024, is an abuse of Congress's taxing and spending power under Article I, Section 8 of the U.S. Constitution. The challenged spending which allocates $26.4 billion in supplemental military aid for Israel, exceeds the constitutional limitation on the taxing or spending power, that it be exercised only for the purpose of serving the General Welfare of the United States and its citizens per *U.S. v. Butler*, 297 U.S. 1 (1936). Plaintiffs find it hard to believe that anyone could even suggest or argue that commission of genocide is necessary or proper for the "general welfare or common defense" of the U.S.

Plaintiffs maintain that ISSA is also unconstitutional and not serving the general welfare or common defense because it egregiously violates and conflicts with various U.S. and international laws prohibiting genocide and complicity in genocide, including treaties, ratified and implemented by the U.S. that criminalize genocide and promise to prosecute all who commit the crime or are guilty of complicity in genocide.

A. **The holding in *Flast* does not limit taxpayer lawsuits to Establishment Clause claims.**

The attempt by Defendants to rely on *Hein v. Freedom From Religion Foundation, Inc.,* 551 U.S. 587 (2007) and *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806 (8th Cir. 2022) is misplaced. The decision in both cases to deny taxpayer standing was not based on the nature of the constitutional challenge being limited only to those arising under the Establishment Clause but was instead based on the lack of challenge to any specific congressional enactment. *Hein* plaintiffs could only complain of "appropriations for the general administrative expenses, over which the President and other executive branch officials have a degree of discretionary power." 551 U.S. 587 (2007) at 597. The *Hein* Court (citing *Flast,* 382 U.S., at 102) accordingly held that:

> "...this case falls outside the 'the narrow exception' that *Flast* "created to the general rule against taxpayer standing established in *Frothingham.*
> Because the expenditures that respondents challenge were not expressly authorized or mandated by any specific congressional enactment, respondents' lawsuit is not directed at an exercise of congressional power and thus lacks the requisite 'logical nexus' between taxpayer status "'and the type of legislative enactment attacked.'" (Citations omitted).  551 U.S. 587 at 608.

The *Hein* Court thus made clear that it was not reconsidering the precedent of *Flast* or limiting it to Establishment Clause claims but was "leav(ing) it as they found it," *Id.* at 615, instead of extending it as the Court of Appeal had wrongly decided. Any claim that *Flast* is solely limited to Establishment Clause claims would thus be incorrect. *Flast* requires only that the challenged spending

50

enactment be a specific enactment such as ISSA and be challenged as an unconstitutional use of the taxing and spending power:

"We have noted that the Establishment Clause of the First Amendment does specifically limit the taxing and spending power conferred by Art. I, § 8. **Whether the Constitution contains other specific limitations can be determined only in the context of future cases."** (*Emphasis added.*) *Flast v Cohen,* 382 U.S. 83, 105 (1968).

Likewise, in *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 812 (8th Cir. 2022), the ruling turned on the fact that Plaintiffs were challenging spending not legislatively mandated, per the requirements of *Flast*, citing *Hein* where the plurality of the Court rejected standing for even an Establishment Clause claim when taxpayers "could cite no statute whose application they challenge." *Hein*, 551 U.S. at 607.  Finally in 2025 the United States Court of Appeals for the Eighth Circuit reviewed the *Huizenga* case de novo and held that two of the residents, as current municipal taxpayers, DID have Article III standing and that the expenditure of their tax funds DID constitute a direct injury to municipal taxpayers. *Huizenga v. ISD No. 11,* No. 24-1862 (8th Cir. 2025).

Defendants' citing of *Mahorner v. Bush*, 224 F.Supp.2d 48 (D.D.C. 2008) similarly does not help Defendants' argument since it (and presumably the other decisions Defendants cite) are also in accord with *Hein* and *Flast* in finding that the plaintiff taxpayers in those cases lacked standing because they did "not

51

challenge any act of Congress but only expenditures by the executive branch." *Id.* at 50-51.

By contrast, the ISSA that Plaintiffs are presently challenging IS a specific congressional spending enactment and not merely general expenditures by the executive branch. A specific spending enactment that allocates tax dollars for an unconstitutional purpose such as providing funds to further the careers of male only college athletes could be challenged similarly to an allocation funding religious schools (per *Flast*). Providing funds for a purpose outside the limitation that the funds allocated be for the ***general welfare***, such as an allocation of funds to underwrite construction of Jewish settlements in Palestine, could also be challenged as unconstitutional under *Flast*. How far the Court will go "…can be determined only in the context of future cases." *Flast v Cohen,* 382 U.S. 83, 105 (1968). At this point the door remains open.

It's true that the facts of *Flast* comprised a challenge to a specific congressional enactment violating the Establishment Clause but Defendants have provided no authority as to how standing under *Flast* has yet been held to be limited to Establishment Clause claims. Plaintiffs' claims are consistent with the standing requirements of *Flast* that the challenged specific spending enactment be an unconstitutional use of the taxing and spending power under Article I, section 8.

**B. Plaintiffs have also met traditional requirements for Article III standing by demonstrating their injuries are direct, real, substantial, fairly traceable to and proximately caused by Congress's wrongful passage of and then Defense Secretaries' implementation of ISSA supplemental funding in support of Israel's ongoing genocide.**

Plaintiffs' mental and physical injuries are the result of emotional and moral harm suffered and directly caused by the illegal actions of their sworn representatives ensnaring Plaintiff Taxpayers in the significant trauma and shame of complicity in the worst of all crimes, not only a genocide the world promised would "never again" happen, but a live-streamed genocide wherein there is even less excuse this time that the "otherwise good citizen" did not know (in contrast with WWII).

The massive ongoing slaughter and starvation of mostly women and children, even babies, in a trapped civilian population have played out daily causing anguished Plaintiffs as Minnesota taxpayers to fight their feelings of helplessness at witnessing this carnage through various political activity including protest demonstrations/marches, prolonged fasting and desperate attempts at humanitarian acts, nearly all of which seem to have proved thus far futile to make a dent in the horror of ever-continuing genocide.

Plaintiffs agree with prior precedent on standing, including that "the Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and law, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992).

But we would also again cite *Flast* for its formulation that the "'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Flast*, 382 U.S. at 99, citing *Baker v. Carr*, 369 U.S. 186, 369 (1962).

How does this taxpayer complicity in genocide produce direct and severe injuries to Plaintiffs? In addition to the financial injuries to Plaintiffs as a result of varying dollar amounts[2] they must pay in taxes in order to illegally fund ISSA, the

------

[2] Plaintiffs' monetary injuries as taxpayers are also not insignificant. Each taxpayer's share of the $26.4 billion spending bill if divided equally among each US taxpayer, would amount to almost $200 in tax or debt obligation. For all

actual feelings of betrayal, outrage, disappointment, intense shame,

embarrassment, depression and the like, sometimes metastasizing into physical

illness and self-harm, already suffered by Plaintiffs (and constantly worsening) are

hardly de minimis but very real, immediate and direct.

If the Court would grant Plaintiffs a hearing, they would be able to testify as

to their extreme suffering, the physical health problems that some have

experienced and the risks some have incurred trying to take humanitarian aid to the

victims of this genocide, all from trying to live with their consciences while facing

the reality that their tax dollars are being used to purchase arms for Israel during a

time of genocide. If nothing else, Plaintiffs would also request leave of the Court

to file their own personal affidavits further describing and explaining these direct

and proximately caused injuries as a part of the Court's judicial review.

### C. The Concept of Moral Injury

Moral Injury as a concept reached professional literature via the *Clinical*

*Psychology Review* (29 CLINICAL PSYCHOL. REV. 695-706 (2009)) describing

the suffering of war veterans as "Perpetrating, failing to prevent, bearing witness

to, or learning about acts that transgress deeply held **moral** beliefs and

---

Minnesota taxpayers, it would amount to estimated **tax or** debt obligations of over
$500 million.

expectations. This may entail participating in or witnessing inhumane or cruel actions, failing to prevent the immoral acts of others, as well as engaging in subtle acts or experiencing reactions that, upon reflection, transgress a moral code."

Since the 2009 *Psychology Review* publication began to expand understanding about such harmful and actual injury, often involving post-traumatic stress and manifesting in forms of physical illness (and a highly disproportionate number of suicides and attempted suicides[3]), the concept is now applied widely beyond the military. Rather than an abstract moral grievance, the psychological, emotional harm is itself injury-in-fact that has been historically and increasingly found sufficient for standing, especially in torts like intentional infliction of emotional distress.

See Psychological Harm and Constitutional Standing by Rachel Bayefsky (Brooklyn Law Review, Vol. 81, 1555 (2016) arguing for the explicit recognition of psychological harm as injury-in-fact and providing an in depth analysis of the role of psychological harm in constitutional standing doctrine, noting that the

---

[3] According to the 2024 National Veteran Suicide Prevention Annual Report from the Department of Veterans Affairs (VA), there was an average of 17.6 veteran suicides per day in 2022.

"Supreme Court has not precluded the recognition of psychological harm as injury-in-fact."

Plaintiff, Deacon Dr. Amy Blumenshine is herself an expert in moral injury which was the subject of her dissertation and many of her published works including a book and many articles. Blumenshine explains how Plaintiffs' injuries are also "fairly traceable" to Defendant's alleged wrongful conduct using this metaphor:

> "Consider the deadly spear of harm/violence done to Palestinian civilians, mostly children. While the bombs may be the head of the spear, the votes of my senators put *my* hands on the shaft of the spear. Without the taxes that I and others have paid, Israeli officials would not be able to kill and torture to extermination the Palestinians and seize their lands."

Plaintiffs have met the Article III standing requirements under both the case or controversy standard and the standards set forth in both the *Flast v. Cohen* and *Baker v. Carr* decisions.

Even a simple declaratory judgment in the present civil case would help redress and relieve the moral and other injuries that Plaintiffs, wrongfully made complicit in genocide, have suffered and are still suffering. A simple acknowledgement of the illegal wrong done and still occurring could start Plaintiffs on the road to recovery.

# VI.  CONCLUSION

The judicial review required to "say what the law is" and resolve legal disputes and the legal issues they raise, is the crux of the rule of law and of this case. *Marbury v. Madison* 5 U.S. (1 Cranch) 137 (1803):

> "The very essence of civil liberty certainly consists in the right of every individual to claim protection of the laws whenever he receives an injury." *Marbury, Id.,*163. And, "It is emphatically the province and duty of the Judicial Department to say what the law is. Those who apply the rule to particular cases must, of necessity, expound and interpret that rule. If two laws conflict with each other, the Courts must decide on the operation of each." *Id. a*t 177.

This case at bottom is ultimately about a court, a singular judge, resolving legal issues and not being deterred by the unprecedented novelty of the issues presented nor by unbounded notions of "political question doctrine", a primacy that would turn a "nation under law" into one proclaiming itself above the law. For all the foregoing reasons, we urge this honorable Court to provide the proper legal guidance this case deserves, and to avoid the chimera of summary dismissal which would leave the executive and legislative branches unconstrained even when grave, unlawful support of genocide is occurring.

**Case no 25-cv-02059-ECT-LIB**

**EXHIBIT 1 to Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss and in Support of Declaratory Judgment: Bibliography of public source investigative authorities indicating factual evidence of genocide of Palestinians in Gaza from October 2023 to December 2024**

13 October 2023, Raz Segal, https://jewishcurrents.org/a-textbook-case-of-genocide…

15 October 2023: Public Statement: Over 800 Scholars Warn of Potential Genocide in Gaza https://twailr.com/public-statement-scholars-warn-of-potential-genocide-in-gaza/…

2 November 2023: UN experts call to **prevent** genocide: https://un.org/unispal/document/gaza-is-running-out-of-time-un-exp erts-warn-demanding-a-ceasefire-to-prevent-genocide/…

16 November: UN experts call to prevent genocide: https://ohchr.org/en/press-releases/2023/11/gaza-un-experts-call-international-communit y-prevent-genocide-against…

16 November 2023: William Schabas: https://ccrjustice.org/sites/default/file s/attach/2023/11/Declaration%20Expert%20William%20Schabas_w.pdf…

16 November 2023: Holocaust and genocide scholars John Cox, Victoria Sanford, and Barry Trachtenberg declaration, https://ccrjustic e.org/sites/default/files/attach/2023/11/Historians%20Declaration_w.pdf…

29 December 2023, South Africa submission to ICJ: https://icj-cij.org/sites/default/files/case-related/192/192-20231228-app-01-00-en.pdf…

Forensic Architecture: An Assessment of Visual Material Presented by the Israeli Legal Team at the International Court of Justice (ICJ)

12 January 2024, https://forensic-architecture.org/investigation/assessment-israeli-material-icj-jan-2024
29 May 2024, South Africa's dossier of evidence of Israel's genocidal intent, the UN Security Council: https://tinyurl.com/nb6ua4a5

UN Expert Francesca Albanese, first report on the Genocide (March 2024): https://ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/sessions-regular/session55/advance-versions/a-hrc-55-73-auv.pdf…

UN Expert Francesca Albanese, second report on the Genocide (October 2024): https://documents.un.org/doc/undoc/gen/n24/279/68/pdf/n2427968.pdf……

John Quigley, "Legal Standard for Genocide Intent: An Uphill Climb for Israel in Gaza Suit", 14 March 2024, EJIL: https://ejiltalk.org/legal-standard-for-genocide-intent-an-uphill-climb-for-israel-in-gaza-suit/

UK Judges' and Lawyers' Open Letter Concerning Gaza, 3 April 2024: https://lawyersletter.uk

Jinan Bastaki, Gaza, Forced Displacement, and Genocide", EJIL, April 2024, https://ejiltalk.org/gaza-forced-displacement-and-genocide/…

Nimer Sultany, "A Threshold Crossed: On Genocidal Intent and the Duty to Prevent Genocide in Palestine", May: https://tandfonline.com/doi/full/10.1080/1462352 8.2024.2351261…

University Network for Human Rights report, May 2024: https://humanrightsne twork.org/publications/genocide-in-gaza…

Aryeh Neier, NYRB, 6 June 2024:https://nybooks.com/art icles/2024/06/06/is-israel-committing-genocide2024-aryeh-neier/? srsltid=AfmBOopOf1xbf1Ucx3Bvo11n N7VEEL-J7IA6jCNd9mhgWGeSUcLgQ9Y7…

UN Commission of Inquiry, 10 June: Detailed findings on the military operations and attacks carried out in the Occupied Palestinian Territory from 7 October to 31

December 2023: https://ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/sessions-regular/session56/a-hrc-56-crp-4.pdf…

Oxfam, Water War Crimes report, July 2024: https://oxfam.org/en/press-releases/israel-using-water-weapon-war-gaza-supply-plummets-94-creating-deadly-health…

Omer Bartov, 13 August 2024: https://theguardian.com/world/article/2024/aug/13/israel-gaza-historian-omer-bartov…

Haaretz, "The Numbers Show: Gaza War Is One of the Bloodiest in the 21st Century", 14 August 2024: https://haaretz.com/middle-east-news/palestinians/2024-08-14/ty-article-magazine/.premium/the-death-toll-in-gaza-is-bad-even-compared-to-the-wars-in-ukraine-iraq-and-myanmar/00000191-50c6-d6a2-a7dd-d1decf340000…

Maryam Jamshidi, On Genocidal Intent, August 2024:https://opinio juris.org/2024/08/02/reflecting-on-genocidal-intent-in-the-icj-case/

AOAV analysis that shows  vast majority of killed in Gaza are civilians: https://aoav.org.uk/2024/casualties-in-gaza-israels-claims-of-50-combatant-deaths-dont-add-up-at-least-74-of-the-dead-are-civilians/

10 October 2024: UN Commission of Inquiry: Israel's destruction of the health system in Gaza https://ohchr.org/en/press-releases/2024/10/un-commission-finds-war-crimes-and-crimes-against-humanity-israeli-attacks

8 November 2024: UN Commission of Inquiry: 70 percent of verified victims (October - 30 April) were children and women: https://ohchr.org/en/documents/reports/six-month-update-report-human-rights-situation-gaza-1-november-2023-30-april-2024…; 1

12 November 2024: 8 aid organizations of the systematic violation ICJ orders on humanitarian assistance, thereby establishing genocidal intent: https://oxfam.org/en/press-releases/joint-release-israel-receives-failing-grade-us-demands-gaza…;

14 November 2024: UN Special Committee Report https://ohchr.org/en/press-releases/2024/11/un-special-committee-finds-israels-warfare-methods-gaza-consistent-genocide

North Gaza: 9 October 2024: 18 Aid organizations warn of dramatic escalation of humanitarian catastrophe in northern Gaza: https://oxfam.org.uk/media/press-releases/aid-organisations-warn-of-dramatic-escalation-of-humanitarian-catastrophe-following-further-mass-forced-displacement-of-civilians-in-northern-gaza/

15 October 2024, 38 organizations: "Northern Gaza is being wiped off the map": https://oxfam.org/en/press-releases/urgent-joint-statement-northern-gaza-being-erased-global-leaders-must-act-now-end...;

1 November 2024: statement by 15 UN and humanitarian organizations: http://bit.ly/40pLGqx

'You Feel Like You Are Subhuman:' Israel's Genocide Against Palestinians in Gaza, Amnesty International, 4 December 2024, file:///C:/Users/tjlod/Downloads/MDE1586682024ENGLISH.pdf

Shaw, M. (2026), The Genocide that Changed the World. *Journal of Genocide Research*, *28*(3), 588–602. https://doi.org/10.1080/14623528.2025.2556575

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: April 15, 2024

Signature of Plaintiff /s/ _William M. Sorem_

Printed Name _William M. Sorem_

Mailing Address _1434 Stewart Lane_
_Minnetonka, MN 55345_

Telephone Number _952-239-1169_

Email address _billsorem@me.com_

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: 4/15/2026

Signature of Plaintiff /s/ _Fiona L Roedl_

Printed Name _Fiona L Roedl_

Mailing Address _4520 33rd Ave S._

_Minneapolis MN 55406_

Telephone Number _612 242 1999_

Email address _fionaroedl@gmail.com_

RECEIVED

APR 1 5 2026

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: 4/15/26

Signature of Plaintiff /s/ *Amy A. Blumenshine*

Printed Name   *Amy A. Blumenshine*

Mailing Address   *3156 Elliot Ave. S.*
   *Minneapolis, MN 55407*

Telephone Number   *(612) 822-6059*

Email address   *amyblumenshine@mac.com*

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: 4/15/2026

Signature of Plaintiff /s/ _Janice Ward_

Printed Name _NANICE WARD_

Mailing Address _48063 Big Isl Rd_

_MARcell, MN 56657_

Telephone Number _218-832-3946_

Email address _Forgetmenot @ Bigfork.Net_

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: 4-15-26

Signature of Plaintiff /s/ *David G Evenhouse*

Printed Name     David G. Evenhouse

Mailing Address     48063 N. Big Island Rd
Marcell MN 56657

Telephone Number     218-832-3946

Email address     devenhouse48@gmail.com

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: April 15, 2026

Signature of Plaintiff /s/ Darlene M. Coffman

Printed Name    Darlene M. Coffman

Mailing Address    1019 Chalet Drive NW

Rochester, MN 55901

Telephone Number    507-513-1736

Email address    darlenecoffman@yahoo.com

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: 4/15/2026

Signature of Plaintiff /s/ _Carol J. Walker_

Printed Name _Carol J. Walker_

Mailing Address _1311 Earl St._

_St. Paul, MN 55106_

Telephone Number _651-774-5795_

Email address _carolwalks4@gmail.com_

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: April 15, 2026

Signature of Plaintiff /s/ *Michael J. Madden*

Printed Name Michael J. Madden

Mailing Address 1768 Iglehart Avenue
Saint Paul, MN 55104

Telephone Number 651-644-2288

Email address mike@mudpuppies.net

**Re: PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF DECLARATORY JUDGMENT AND/OR EVIDENTIARY HEARING SOUGHT BY PLAINTIFFS**

(Signature below, if not in original ink, then original ink signature is maintained by the undersigned for any later Court inspection.)

DATED: *April 15, 2026*

Signature of Plaintiff /s/ *Coleen Rowley*

Printed Name *Coleen Rowley*

Mailing Address *193 Beaumont Ct,*
*Apple Valley, MN 55124*

Telephone Number *952 393-0914*

Email address *rowleyclan@earthlink.net*